**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Millia Promotional Services, et al., | No. CV-18-04701-PHX-SMM |
| Plaintiffs, | **ORDER** |
| v. | |
| Arizona Department of Economic Security, et al., | |
| Defendants. | |

Pending before the Court is Defendants' Motion for Summary Judgment. (Doc. 77). The Motion is fully briefed. (Docs. 87, 91). For the reasons set forth below, the Court grants Defendants' Motion.

**I.    Background and Procedural History**

Plaintiffs are Khamillia Harris, an African-American woman, and Millia Promotional Services ("MPS"), an Arizona nonprofit organization founded by Harris that provides rehabilitative instructional services, disability employment services, and educational services. (Doc. 14 at 3). This lawsuit arises out of the contractual relationship between MPS and the Arizona Department of Economic Security ("ADES"), Division of Employment and Rehabilitation Services ("DERS"). DERS is a state agency that provides employment, career, and disability-related services to qualified individual clients under a federal program. (Doc. 78 at 2). To carry out its work, DERS contracts with private vendors, who provide services to DERS clients. (Id.) MPS is one such vendor. (Id.)

Relevant here are two contracts that MPS entered into with DERS: a Rehabilitation

Instructional Services ("RIS") contract for rehabilitative services entered into in October 2015 and a disability employment related services ("DRES") contract entered into in August 2016. (Id.) At the time, MPS was one of 38 RIS vendors and one of 22 Career Exploration and Supported Education vendors within Arizona. (Id.)

On June 11, 2016, Harris requested an increased pay rate for her vendor contracts. (Doc. 88-1 at 14). That request was denied. (Doc. 78 at 3). In a July 20, 2016 email sent to Harris by a non-defendant ADES procurement specialist, it was explained that ADES was "currently attempting to negotiate a lower price on all of our . . . [vendor] contracts by asking all of our vendors to give the State a 10% reduction in all contract pricing." (Doc. 88-1 at 23). Rather than agreeing to Harris' proposed rate increase or asking her to reduce her fees by 10%, ADES decided to "leave [MPS'] rates the same" as a "compromise." (Id.)

DERS employee Benjamin White—who is not a defendant in this case—was initially responsible for overseeing the application process that resulted in MPS' contract with DRES, signed in August 2016. (Doc. 14 at 7). In June 2016, White told Harris that "[a]s a new vendor, you can be invited to sit at the table to eat, but you will be only offered bread crumbs compared to the other vendors until you make a name for yourself." (Id. at 6-7). A few days later, White responded to Harris' inquiry about the status of some of her application materials by joking that it was possible that someone in the office had "used [them] for toilet paper." (Id. at 7). Harris reported this remark to White's supervisors, who removed White from his position overseeing Plaintiffs' DRES contract application process. (Id.)

On July 26, 2016, White emailed MPS. (Doc. 88-1 at 17). After seeking clarification about MPS' nonprofit status, White told Harris that he had received an objection from an unnamed party about a reference to MPS' ADES contract and the listing of DERS as a sponsor on MPS' website. (Id.) White claimed not to fully understand the objection but cited the relevant provision from the contract's Uniform Terms and Conditions: "The Contractor shall not use, advertise or promote information for commercial benefit concerning this Contract without the prior written approval of the Procurement Officer."

(Id.) White informed Harris that the references to DERS on MPS' website was fine if it had been "cleared by the ADES Chief Procurement Officer." (Id.) White told Harris that she "might want to address this matter at some time." (Id.)

In reply, Harris asked White to put her in touch with the person who had spoken to him about MPS' website. (Id.) Two hours later, White emailed Harris letting her know that he would "notify the Procurement Specialist about your request." (Id. at 18).

The following morning, a non-defendant ADES procurement specialist wrote to Harris to follow up on a conversation the two had had earlier that morning. (Id. at 20). The specialist provided Harris with the names and contact information for the two procurement specialists assigned to MPS' contracts and told Harris that at least one of them "will be more than happy to assist you with all of your questions and concerns regarding both contracts." (Id.) Neither party has stated or provided evidence that Harris replied to the procurement specialist's email. Harris did not follow up by requesting the use of the DERS logo and name on the MPS website. (Doc. 78-1 at 57-59). Instead, Harris removed them from the website. (Id.)

Among MPS' clients was Client S. (Doc. 78 at 5). In April of 2017, Client S decided to transfer from one ADES office to another. (Doc. 78 at 6; Doc. 88-1 at 64). At the new office, Client S met with his new Vocational Rehabilitation ("VR") counselor, Defendant Rollonda Daugherty, who audited the services Client S had previously received. (Id.; Doc. 88-1 at 91). The results of the audit gave Daugherty "great concern" as the authorized number of hours of services Client S had received "far exceeded" the amount of hours laid out in his individualized plan for employment. (Doc. 88-1 at 92). Further, it appeared to Daugherty that Client S had "not been making progress." (Id.) Client S stated that he felt he was being "set up for failure" because although he was supposed to be going to school as part of his services, his "several learning disabilities" meant he only lasted "a couple of days or a couple of weeks." (Id.) As a result, Daugherty met with Defendant Crystal Poetz—her supervisor—about Client S. (Id.)

Client S' previous goals had been to work as a nursing assistant, patient care

technician, and lab technician. (Doc. 78 at 6). Despite the many hours Client S had worked with MPS, he had not sought disability resource services or accommodations to help with his reading deficiencies and had completed some but not all required documents related to his education. (Id.; Doc. 88-1 at 94). Client S's spelling was at a third-grade level and math at a fourth-grade level. (Doc 78 at 7). Based on the audit, Daugherty and Poetz determined that he did not have the aptitude to continue on the goals he had set with MPS. (Id.) Daugherty and Poetz recommended to Client S that he keep his current job, complete a reading course he was taking, and when he felt he was ready, reapply for services with DERS. (Id.) Client S seemingly followed this advice and did not seek further services with DERS—and, by extension, with MPS. (Id. at 8).

On May 2, 2017, Harris and Defendant Traci Zweig-Przecioski met to discuss Harris' concerns with how DERS handled Client S. (Id. at 8). Despite the initial concerns about MPS overbilling for its work with Client S, Zweig-Przecioski later learned that Harris had received verbal authorization from a non-defendant VR counselor for all the additional hours billed. (Id.; Doc. 88 at 10; Doc. 88-1 at 69). At this meeting, Zweig-Przecioski allegedly told Harris that Poetz had found Harris to be "combative, aggressive, unapproachable, and not easy to talk to as [she] talk[s] over people.". (Doc. 88 at 15; Doc. 88-1 at 77). Nevertheless, MPS was paid for all hours requested. (Doc. 78 at 8; Doc. 88 at 4).

Another of MPS' clients was Client M, who MPS began working with in July 2017. (Doc. 88-5 at 85). Less than three months later, DERS—through non-Defendant Lisa Adamu—ended Client M's services. (Id.) Adamu explained to Harris that Client M's case was closed was because Client M needed training and education in order to overcome "barriers to employment" and that Client M agreed with the change. (Id.; Doc. 88-2 at 62).

On August 15, 2017, Harris met with Defendant Kristen Mackey—Zweig-Prezecioski's supervisor—to discuss concerns that MPS was being treated differently to other vendors, specifically that her case load has been reduced. (Doc. 78-1 at 219-19). In response, Mackey ordered a report on MPS' client numbers, which indicated that MPS'

1   client numbers were consistent with other sole proprietor vendors. (Id. at 205; Doc. 87 at
2   7).

3        On December 14, 2018, Plaintiffs Harris and MPS filed a Complaint in this Court.
4   (Doc. 1). On March 11, 2019, they filed an Amended Complaint, alleging violations of 42
5   U.S.C. § 1981, § 1983, § 1985, and § 1986. (Doc. 14). Plaintiffs named as a Defendant the
6   State of Arizona, acting through the DERS. (Doc. 14). The remaining Defendants are being
7   sued in both their personal and official capacities. (Doc. 14 at 4-5).

8        On April 15, 2022, after the parties had completed discovery, Defendants filed a
9   Motion for Summary Judgment, requesting judgment on all claims. (Doc. 77).

10  **II.    Legal Standard**

11       "A party may move for summary judgment, identifying each claim or defense—or
12  the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ.
13  P. 56(a). A court must grant summary judgment if the pleadings and supporting documents,
14  viewed in the light most favorable to the nonmoving party, show "that there is no genuine
15  dispute as to any material fact and that the movant is entitled to judgment as a matter of
16  law." Id.; see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Jesinger v. Nev. Fed.
17  Credit Union, 24 F.3d 1127, 1130 (9th Cir. 1994). A fact is material if it "might affect the
18  outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S.
19  242, 248 (1986). A dispute is genuine if it is "such that a reasonable jury could return a
20  verdict for the nonmoving party." Id.; see Jesinger, 24 F.3d at 1130.

21       At summary judgment, the judge's function is not to weigh the evidence and
22  determine the truth but to determine whether there is a genuine issue for trial. Anderson,
23  477 U.S. at 249. To survive a defendant's motion for summary judgment, a plaintiff must
24  do more than provide a mere "scintilla of evidence" in support of its position. Id. at 252.
25  Rather, it must provide evidence on which a jury could reasonably find for the plaintiff. Id.

26       A principal purpose of summary judgment is "to isolate and dispose of factually
27  unsupported claims." Celotex, 477 U.S. at 323-24. Summary judgment is appropriate
28  against a party who "fails to make a showing sufficient to establish the existence of an

1  element essential to that party's case, and on which that party will bear the burden of proof
2  at trial." Id. at 322; see also Citadel Holding Corp. v. Roven, 26 F.3d 960, 964 (9th Cir.
3  1994). The moving party need not disprove matters on which the opponent has the burden
4  of proof at trial; instead, the moving party may identify the absence of evidence in support
5  of the opposing party's claims. See Celotex, 477 U.S. at 317, 323-24.

6  **III.    Discussion**

7      Plaintiffs make four claims: that Defendants violated 42 U.S.C. § 1981, § 1983, §
8  1985, and § 1985. (Doc. 14 at 14-17). The latter three claims all rely on the § 1981 claim.[1]
9  The Court focuses its attentions on Plaintiffs' § 1981 claim because if Defendants are
10 entitled to summary judgment on this claim, they are also entitled to summary judgment
11 on the remaining claims. However, before discussing the merits, the Court addresses
12 Defendants' Eleventh Amendment and statute of limitations arguments.[2]

13     **A.    Eleventh Amendment**

14     Defendants contend that the Eleventh Amendment bars Plaintiffs' claims against
15 the State of Arizona and against defendants in their official capacities. (Doc. 77 at 6). In
16 their reply, Plaintiffs do not dispute this—instead, they note that the Eleventh Amendment
17 does not bar suit against defendants in their personal capacities. (Doc. 87 at 23).

18     First, the Eleventh Amendment bars Plaintiffs' claims against the State of Arizona.
19 Fireman's Fund Ins. Co. v. City of Lodi, 302 F.3d 928, 957 (9th Cir. 2002), as amended on
20 denial of reh'g and reh'g en banc (Oct. 8, 2002) (explaining that the Eleventh Amendment
21 bars suits seeking damages or injunctive relief against a State).

22     State officials sued in their official capacities are generally entitled to Eleventh
23 Amendment immunity. Flint v. Dennison, 488 F.3d 816, 825 (9th Cir. 2007). There is,
24 however, an important exception. Id. Agency officials made by sued in their official

---

25 [1] A § 1986 claim can only be made if there is a valid § 1985 claim. Karim-Panahi v. Los
26 Angeles Police Dep't, 839 F.2d 621, 626 (9th Cir. 1988). A § 1985 claim can only be made
   if there is a valid § 1981 or § 1983 claim. Astre v. McQuaid, 804 F. App'x 665, 667-68 (9th
27 Cir. 2020). And in turn, a § 1983 claim can only be made if there is a valid § 1981 claim.
   Id. at 667.
28 [2] Defendants also raise a standing argument for the first time in their Reply. (Doc. 91 at 5).
   Because the Court grants Defendants' Motion for Summary Judgment on other grounds, it
   will not address standing.

1    capacities for prospective injunctive relief. Id.; Los Angeles Cnty. Bar Assoc. v. Eu, 979

2    F.2d 697, 704 (9th Cir. 1992) (citing Ex Parte Young, 209 U.S. 123, 155-56 (1908)).

3         Here, Plaintiffs have sued several Defendants in their official capacities and seek an

4    injunction ordering Defendants not to discriminate and retaliate against Plaintiffs in the

5    future. (Doc. 14 at 19). Because this is prospective injunctive relief, Plaintiffs may continue

6    to seek this relief from Defendants in their official capacities. However, the Eleventh

7    Amendment bars Plaintiffs from seeking any other relief against the Defendants in their

8    official capacities.

9         **B.    Statute of Limitations**

10        Section 1981 does not provide a statute of limitations. 42 U.S.C. § 1981; Jones v.

11   R.R. Donnelley & Sons Co., 541 U.S. 369, 371 (2004). Instead, the statute of limitations

12   depends on whether the claim was cognizable before the Act's 1990 amendments or only

13   made cognizable by those amendments. Lukovsky v. City & Cnty. of San Francisco, 535

14   F.3d 1044, 1048, n.2 (9th Cir. 2008) (citation omitted). If a claim was cognizable before

15   the 1990 amendments, the statute of limitations is set by the relevant state's statute of

16   limitations for personal injury torts. Id. at 1048. In Arizona, that statute of limitations is

17   two years. A.R.S. § 12–542(2). If, however, the claim would only be cognizable after the

18   1990 amendments, then a federal catch-all statute of limitations of four years applies.

19   Lukovsky, 535 F.3d at 1048 n.2; see Jones, 541 U.S. at 382. Thus, whether the statute of

20   limitations for Plaintiffs' claims is two years or four depends on whether each claim was

21   cognizable in the pre-1990 version of the Act.

22        The 1990 amendments expanded the definition of "make and enforce contracts" to

23   include the "termination of contracts, and the enjoyment of all benefits, privileges, terms,

24   and conditions of the contractual relationship." § 1981(b); see Jones, 541 U.S. at 373. The

25   main effect of this expansion was to allow for claims centering around harassing conduct

26   that took place post-contract formation. Jones, 541 U.S. at 372-73.

27        Defendants assert that Plaintiffs' claims centering around the denial of rate increase,

28   the contract application process, and denial of use of DERS/RSA logo constitute claims

cognizable before the 1990 amendments and thus each have two-year statutes of limitations. (Doc. 77 at 7). The Court will address the nature of each claim in turn.

First, Plaintiffs do not dispute that their request for a pay rate increase constitutes an issue of contract formation, was therefore cognizable before the 1990 amendments, and carries a two-year statute of limitations. Rather, Plaintiffs argue that the statute of limitations for the denial of pay rate increase claim began tolling at a later date—from May 2, 2017 rather than from July 20, 2016. They argue that, although they were denied a rate increase on July 20, 2016, they only realized that they had a "cognizable legal claim for racial discrimination" at this later date. (Doc. 87 at 21). Plaintiffs cite <u>Lukovsky</u> for the proposition that a claim accrues when the plaintiff knows or has reason to know of the injury that is the basis of the action. (<u>Id.</u>); <u>Lukovsky</u>, 535 F.3d at 1048.

<u>Lukovsky</u> makes clear however, that it is a plaintiff's knowledge of the actual injury that triggers accrual, rather than knowledge of the "legal injury, i.e., that there was an allegedly discriminatory motive . . . ." <u>Lukovsky</u>, 535 F.3d at 1051. Here, Plaintiffs knew of the actual injury on July 20, 2016, when they were informed that they would not be receiving a rate increase. (Doc. 88-1 at 23). Their later knowledge or belief that there was an allegedly discriminatory motive is irrelevant for determining when a claim accrues for purposes of the statute of limitations. Thus, the statute of limitations for Plaintiffs' claim based on denial of a rate increase began tolling on July 20, 2016. Plaintiffs commenced this action over two years later, on December 14, 2018, and thus their claims stemming from the denial of a rate increase are barred by the statute of limitations.

Second, Mr. White's comment about toilet paper was made during and about Plaintiffs' application for an RIS contract. (Doc. 78 at 4). This claim therefore falls squarely within the pre-1990 amendments' definition of "mak[ing] and enforce[ing] contracts" because they pertain to contract formation. They therefore carry a two-year statute of limitations. Mr. White's comments were made in July 2016 and the statute of limitations accrued in July 2018. (<u>Id.</u>) Because Plaintiffs filed their claim in December 2018, the two-year statute of limitations bars Plaintiffs from bringing a claim based on this comment.

Third, Plaintiffs' claim centering around Defendants' denial of their use of the DERS/RSA logo on their website is not an issue of contract formation but rather pertains to the "benefits, privileges, terms, and conditions" of their existing contractual relationship with Defendants. It is a post-formation claim that could only have been made under the 1990 amendments and therefore has a four-year statute of limitations. Plaintiffs were warned about their use of the logo on July 20, 2016 and filed their claim in December 2018—well within the four-year statute of limitations. A claim based on this alleged injury is therefore not barred by the statute of limitations.

### 1.     Plaintiffs' Defenses to Statute of Limitations

Plaintiffs raise three equitable defenses to Defendants' statute of limitations arguments.

### (a)     Equitable Tolling

First, Plaintiffs argue that even if their claim based on the denial of a rate increase did accrue in July of 2016, the statute of limitations was equitably tolled until May 2, 2017. (Doc. 87 at 21). Plaintiffs' argument here centers on the allegation that Defendants' fraudulent actions prevented Plaintiffs from ascertaining that their rights had been violated. (Id. at 22).

Plaintiffs are only entitled to equitable tolling if they can show (1) that they have been pursuing their rights diligently, and (2) that some extraordinary circumstance stood in their way and prevented timely filing. Smith v. Davis, 953 F.3d 582, 597–98 (9th Cir.), cert. denied, 208 L. Ed. 2d 440, 141 S. Ct. 878 (2020) (citing Holland v. Florida, 560 U.S. 631, 649 (2010)). In considering the second element—whether an extraordinary circumstance existed—courts are not bound by "mechanical rules" and should make a determination based on all of the facts of the case. Id. at 600 (citing Holland at 649–50).

Here, there is no indication that Plaintiffs did not diligently pursue their rights. Rather, the issue is whether Plaintiffs have presented a sufficient extraordinary circumstance. Plaintiffs argue that the justifications that Defendants gave for denying a rate increase—justifications that Plaintiffs claim are "fraudulent" and pretextual—present such

an extraordinary circumstance. (Doc. 87 at 21–22). Evaluating the record before it, the Court finds that Defendants' justifications for denying the requested rate increase do not constitute extraordinary circumstance necessary to equitably toll the statute of limitations. Defendants informed Plaintiffs that they were denying the requested rate increase because at that time Defendants were "asking all of [their] vendors to give the State a 10% reduction in all contract pricing" and thus denying the rate increase request but refraining from asking for a reduction represented a "compromise." (Doc. 88-1 at 23). Plaintiffs have not argued that Defendants were not in fact seeking rate reductions from their vendors at this time and have not shown that this justification for denying the rate increase request was fraudulent or pretextual. Indeed, it is undisputed that Defendants reduced the rates for other vendors. (Doc. 78-1 at 21). As such, Defendants' response to Plaintiffs' request for a rate increase appears reasonable, nondiscriminatory, and does not represent an extraordinary circumstance. Because Plaintiffs have failed to meet this second element, the statute of limitations for the denial of rate increase claim will not be equitably tolled.

### (b)   Equitable Estoppel

Next, Plaintiffs argue that Defendants should be equitably estopped from asserting a state of limitations defense for the denial of rate increase claim. (Doc. 87 at 22). Unlike equitable tolling, which focuses on the actions of the plaintiff, equitable estoppel focuses on the wrongful actions of a defendant which prevent the plaintiff from asserting their claim. Leong v. Potter, 347 F.3d 1117, 1123 (9th Cir. 2003). Courts consider a non-exhaustive list of factors, including: "(1) the plaintiff's actual and reasonable reliance on the defendant's conduct or representations, (2) evidence of improper purpose on the part of the defendant, or of the defendant's actual or constructive knowledge of the deceptive nature of its conduct, and (3) the extent to which the purposes of the limitations period have been satisfied." Santa Maria v. Pacific Bell, 202 F.3d 1170, 1176 (9th Cir. 2000), overruled on other grounds by Socop-Gonzales v. I.N.S., 272 F.3d 1176 (9th Cir. 2001), overruled on other grounds by Smith v. Davis, 953 F.3d 582 (9th Cir. 2020). A typical, successful equitable estoppel argument is one where the defendant promises not to plead the statute

of limitations, but later does so anyway. Id. at 1176-77. Equitable estoppel may also apply where a defendant misrepresents or conceals facts necessary to support a discrimination charge. Id. at 1177 (citation omitted).

As with their equitable tolling argument, Plaintiffs hinge their argument here on the claim that Defendants fraudulently concealed their alleged violations of the Civil Rights Act by justifying their actions with false, pretextual reasons. (Doc. 87 at 22). Yet Plaintiffs' equitable estoppel argument must fail for the same reason as its equitable tolling argument. As the Court addressed above, Defendants have given a reasonable explanation for their denial of a rate increase and Plaintiffs have not provided any concrete evidence of any wrongful action or improper purpose—i.e., that this explanation was in fact fraudulent or pretextual. Further, Plaintiffs have not presented any evidence that Defendants concealed or misrepresented any facts necessary to support a discrimination charge—arguing only that they allegedly concealed their true motives. As such, there is insufficient evidence of improper purpose on the part of the Defendant for this Court to equitably estop Defendants from asserting a statute of limitations defense.

**(c)     Laches**

Finally, Plaintiffs argue that the equitable defense of laches bars Defendants' statute of limitations defense. (Id.) As Plaintiffs themselves note, however, laches is a defense for defendants to use against plaintiffs who unreasonably delay commencing an action. (Id.) (citing Real Progress, Inc. v. Dwyer v. Trinity Fin. Servs., No. C20-1236-JLR-SKV, at *17 (W.D. Wash. Aug. 6, 2021) (citation omitted)). As such, Plaintiffs may not raise it here.

**D.     Section 1981 Claims**

Plaintiffs make a claim under § 1981, which protects the right to "make and enforce contracts" free from racial discrimination. (Doc. 14 at 14; see 42 U.S.C. § 1981(a)). In evaluating such claims, courts apply the burden-shifting framework outlined in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973). Under this framework, a plaintiff must first present a prima facie case of discrimination. Id. at 802. To do so outside of the employment context, a plaintiff must show that: (1) she belongs to a protected class; (2)

1   the defendants intended to discriminate against her on the basis of her race; (3) she was

2   engaged in an activity protected under the statute; and (4) the defendants interfered with

3   that activity. Lindsey v. SLT L.A., LLC, 447 F.3d 1138, 1145 (9th Cir. 2006).[3]

4       If the plaintiff can show such a prima facie case, the burden shifts to the defendant

5   to articulate some legitimate, nondiscriminatory reason for the challenged conduct. Weil

6   v. Citizens Telecom Servs. Co., LLC, 922 F.3d 993, 1002 (9th Cir. 2019) (citing

7   McDonnell Douglas, 411 U.S. at 802). If they can do so, the plaintiff may then show, via

8   competent evidence, that the articulated reason was merely pretextual. Id.

9       Here, there is no dispute that Harris—as an African-American—belongs to a

10  protected class. There is also no dispute that Plaintiffs' contractual relationship with DERS

11  is protected under § 1981. Instead, Defendants base their argument largely around the

12  second and fourth elements, arguing that Plaintiffs have not presented evidence showing

13  either that Defendants intended to racially discriminate against Plaintiffs or that their

14  existing contractual rights were violated. (Doc. 77 at 7-13). And even if Plaintiffs did make

15  out a prima facie case, Defendants argue, their actions were taken for legitimate, non-

16  discriminatory reasons, which Plaintiffs have failed to prove were pretextual. (Id. at 11-12,

17  15). The Court agrees with Defendants on both fronts. Plaintiffs have failed to establish a

18  prima facie § 1981 claim and, even if they had, Defendants have articulated legitimate,

19  nondiscriminatory reasons for their actions which Plaintiffs have not shown to be

20  pretextual. Despite the lengthy record produced during discovery, Defendants have shown

21  an "absence of evidence to support [Plaintiffs'] case." Celotex, 477 U.S. at 325.

22      **(1)   Prima Facie § 1981 Case**

23          **(a)   Loss of referrals and loss of Client S as a client**

24      Plaintiffs argue that their loss of referrals and Client S' transfer to a different vendor

25  are actionable under § 1981. (Doc. 14 at 14). Section 1981 offers relief when "racial

---

26  [3] There is a circuit split as to whether plaintiffs must also meet a fifth element in non-
    employment contract-based § 1981 claims—that similarly-situated persons outside the
27  protected class were offered the contractual services that were denied to plaintiffs. Lindsey,
    447 F.3d at 1145. The Ninth Circuit has not ruled on whether this additional element is
28  required. Id. Because the Court finds that Plaintiffs' claim fails even without having to
    meet this additional element, it will not address it here.

discrimination impairs an existing contractual relationship, so long as the plaintiff has . . . rights under the *existing* . . . contractual relationship." <u>Domino's Pizza, Inc. v. McDonald</u>, 546 U.S. 470, 476 (2006) (emphasis added).

Here, Plaintiffs formed two contracts with Defendants and seek relief for the impairment of their existing contractual relationship with Defendants. (Doc. 14 at 12). Specifically, they claim as injuries "loss of referrals" and "interference with contractual relationships." (<u>Id.</u> at 14). To determine if their contractual relationship was impaired, the Court must determine what rights Plaintiffs had under their existing contractual relationship with DERS with regard to continued referrals and noninterference from DERS.

The terms and conditions of Plaintiffs' contracts with Defendants make clear that Plaintiffs possessed no right to continued referrals or to a set number of referrals. The terms and conditions for the 2015 RIS contract make clear that MPS is to provide services "on an as needed, if needed basis. There is no guarantee of the number of referrals to be provided by DERS/RSA." (Doc. 88-1 at 4). Similarly, the DERS Special Terms and Conditions states that DERS "makes no guarantee to…provide any number of referrals." (Doc. 78-1 at 82). As such, the fact that MPS did not gain any new referrals after the disagreements outlined above does not constitute an impairment of Plaintiffs' contractual relationship with DERS. Further, nothing in the terms and conditions of the contracts suggests that Plaintiffs had any right to continued, exclusive work with clients. Indeed, the contract contemplates the "transition [of a client] to a subsequent Contractor." (<u>Id.</u>) Finally, as Defendants note, Plaintiffs were paid for all of their services.

Accordingly, Plaintiffs' lack of referrals and the loss of Client S and other clients do not impair any rights that Plaintiffs had under their existing contractual relationship with DERS. As a result, Section 1981 cannot offer Plaintiffs any relief from these alleged injuries.

Even if the loss of Client S was actionable under Section 1981, Defendants have provided a non-discriminatory explanation for transferring Client S to a new vendor—because Client S showed no progression in his education goal plan. (Doc. 87 at 20; Doc.

88-1 at 92). Based on the evidence, the Court finds this explanation to be legitimate. The burden therefore shifts to Plaintiffs to provide evidence showing that such explanations were merely a pretext for intentional discrimination. The Court will analyze the issue of pretext below.

### (b) Denial of rate increase request

Plaintiffs' claim stemming from the denial of their request for a rate increase is barred by the statute of limitations, as explained above. Regardless, the record presents no evidence that Plaintiffs' contract contained any right to a rate increase. Further, as explained above, Defendants supplied a legitimate, nondiscriminatory reason for declining to increase the rates at which MPS was paid—they were asking all vendors for a 10% reduction in rates. (Doc. 88-1 at 23).

Plaintiffs attempt to paint this explanation as false by categorizing the reduction as Defendants' attempt to bring parity to rates between vendors. (Doc. 87 at 12). Plaintiffs argue that if this rationale was true, "MPS' rate increase would have been approved to achieve parity and equal pay." (Id.) However, Plaintiffs' argument here is unavailing as the record does not support their contention that the 10% reduction was intended to achieve parity and equal pay among vendors. Plaintiffs also point out that Defendant Mackey stated in her deposition that she did not know why MPS' rate increase was denied. (Doc. 87 at 3). Mackey, however, was not responsible for denying Plaintiffs' rate increase request and her lack of knowledge as to why it had been denied is irrelevant.

### (c) Removal of agency logo from website

Plaintiffs allege that White (who is not a party to this litigation) ordered Plaintiffs to remove the DERS logo from the MPS website in retaliation for reporting White's toilet paper comments to his supervisor. (Doc. 14 at 7).

It is unclear what action on Defendants' part here constitutes contractual impairment. Plaintiffs' contract made clear that they had no right to use the agency logo or otherwise refer to their contract with the agency on their website. (Doc. 88-4 at 61). Defendants did not deny Plaintiffs' request to use the logo on their website because

Plaintiffs did not in fact request such use. Defendants did not directly order Plaintiffs to remove it. Rather, White (a non-party) accurately informed Harris that her use of the logo was in violation of the Uniform Terms and Conditions. (Doc. 88-1 at 17). Harris was given the contact information for two employees who could help with a request to use the logo. (Doc. 88-1 at 20). Rather than follow up with these employees to request permission to use the logo, Plaintiffs voluntarily removed the logo, in compliance with the terms of their contract. (Doc. 78-1 at 57–59). This does not constitute a contractual impairment and thus cannot be the subject of a § 1981 claim.

In sum, the record does not indicate that Defendants impaired Plaintiffs' contractual rights and thus Plaintiffs have not presented a prima facie claim under § 1981.

**(2)    Pretext**

Even if the record did support a prima facie claim under § 1981, Plaintiffs' claim would still fail. Had they presented a prima facie claim, the burden would shift to Defendants to articulate a legitimate, nondiscriminatory reason for the challenged action. Weil, 922 F.3d at 1002. Once a defendant has articulated some legitimate, non-discriminatory explanation for their actions, the burden then shifts back to the plaintiff to show that the defendant's stated reasons were merely pretextual. Id. (citing McDonnell Douglas, 411 U.S. at 802). Plaintiffs must not only show that a defendant's stated reasons were false, but that discrimination was the real reason. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993). Plaintiffs can show this in two ways. First, they can present direct evidence proving discriminatory animus. Coghlan v. Am. Seafoods Co. LLC, 413 F.3d 1090, 1095 (9th Cir. 2005). If there is no direct evidence, then plaintiffs can show pretext using circumstantial evidence that is both "specific and substantial." Vasquez v. Cnty. of Los Angeles, 349 F.3d 634, 641 (9th Cir. 2003).

Circumstantial evidence may be substantial when explanations for defendants' conduct provided during litigation proceedings materially contradict explanations given contemporaneously. Godwin v Hunt Wesson, Inc., 150 F.3d 1217, 1222 (9th Cir. 1998). Shifting explanations alone, however, are not necessarily "sufficiently probative" to create

a triable issue with respect to a defendants' intent to racially discriminate. Id.; Nidds v. Schindler Elevator Corp., 113 F.3d 912, 918 (9th Cir. 1996).

Here, as explained above, Defendants have provided legitimate, non-discriminatory reasons for their actions. As such, at the summary judgment stage, the record must show a triable issue as to whether such explanations were merely pretextual. Manatt v. Bank of America, 339 F.3d 792, 801 (9th Cir. 2003) ("Because [plaintiff] failed to introduce any direct or specific and substantial evidence of pretext, summary judgment for [defendant] must be affirmed.").

Plaintiffs do not provide any direct evidence that Defendants' stated reasons were false or that Defendants' actions were in fact motivated by racially discriminatory animus. Instead, Plaintiffs raise several pieces of circumstantial evidence. The Court finds these pieces of circumstantial evidence weak, far from substantial, and finds that they do not create any genuine, triable issue as to pretext, even when viewed cumulatively. The Court addresses each piece of circumstantial evidence in turn.

Poetz's Plantation Comment

Plaintiffs allege that—outside of their presence and not in any relation to Plaintiffs—Poetz "bragged" about her family once owning a "plantation" during a discussion at work. (Doc. 14 at 12). As Harris admits, however, she was not present during this discussion and did not know the context in which this comment was made. (Doc. 78-1 at 73, 75). Further, Plaintiffs do not dispute Defendants' assertion that Poetz made her comment in the context of a conversation about slavery that occurred during Black History Month and that Poetz's tone was mournful rather than bragging. (Doc. 77 at 13). There does not appear to be perfect consistency among those present as to why Poetz may or may not have referenced her ancestors' plantation—Poetz testified that she couldn't remember why it came up, but recalls mentioning a very large farm her family once owned (Doc. 88-1 at 116); Mackey remembered mention of a plantation and its location but didn't provide any context (Doc. 88-1 at 31); Ellis recalls Poetz "tear[ing] up" at a luncheon during Black History Month after telling her coworkers that she thought her family once owned a

- 16 -

Case 2:18-cv-04701-SMM   Document 92   Filed 01/11/23   Page 17 of 19

plantation (Doc. 78-1 at 238). Regardless of the exact phrasing or tone of the remark, the record could not allow a reasonable jury to conclude that merely by mentioning the fact that her ancestors had once owned a plantation, Poetz—let alone other Defendants—would act with racial animus toward Plaintiffs. This circumstantial evidence may be specific, but it is not substantial.

### Poetz's Description of Harris

Plaintiffs allege that Poetz described Harris to Zweig-Przecioski as "combative, aggressive, unapproachable, and not easy to talk to as [she] talk[s] over people to get [her] point across." (Doc. 14 at 10). Plaintiffs argue that "such categorizations were based on prevailing stereotypes used to pejoratively describe African-Americans." (Id.)

Defendants counter that such a description does not invoke race as it could describe a person of any race. (Doc. 77 at 13). Indeed, Harris acknowledged that these descriptors could apply to any individual regardless of race. (Doc. 78-1 at 173). Plaintiffs themselves, in their Response, describe Daugherty—who is not African American—as "combative" and the actions of Daugherty and Poetz as "aggressive." (Doc. 87 at 4, 13, 14). The Court does not rule out that such descriptors could in some circumstances be based on racial stereotypes. Here, however, no reasonable jury could find that this description constitutes substantial evidence of Defendants' racially discriminatory motives.

### Zweig-Przecioski's Bus Metaphor

Plaintiffs next bring up a metaphor that Defendant Zweig-Przecioski used to explain the relationship between DERS, vendors, and clients. In Zweig-Przecioski's metaphor counselors are the bus drivers, clients the passengers, and vendors the bus stops. (Doc. 87 at 6). The counselors deliver clients to the vendors. (Id.) According to Plaintiffs, such a metaphor "seemed" to be a coded racial directive that Ms. Harris should "get to the back of the bus." (Id. at 6, 18). The Court finds that no reasonable jury could deem this a coded racial message. Defendant Zweig-Przecioski's metaphor is a clear and effective one, does not feature anyone sitting at the back of any bus, and Plaintiffs—in this metaphor—do not even ride the bus. This is far from "substantial" circumstantial evidence of pretext.

- 17 -

1                <u>White's Crumbs Metaphor</u>

2        Plaintiffs raise another metaphor as evidence of pretext. During the application

3 process for the DRES contract, Plaintiffs alleges that White (who is not a defendant) told

4 Harris that "as a new vendor, you can be invited to sit at the table to eat, but you will only

5 be offered bread crumbs compared to the other vendors until you make a name for

6 yourself." (Doc. 14 at 6–7). As with the bus metaphor, however, no reasonable jury could

7 find this metaphor to be substantial evidence of racially discriminatory animus.

8              <u>White's Toilet Paper Comments</u>

9        Plaintiffs also point to another comment made by non-defendant White during the

10 DERS contract application process—his "joke" to Harris that perhaps a misplaced

11 application form of hers had been "used…for toilet paper." (<u>Id.</u> at 7). White's comment

12 was certainly crass and unprofessional and White was removed from his role overseeing

13 Plaintiffs' contract application as a result. (Doc. 14 at 7; Doc. 78 at 4). Again, however, the

14 Court finds that no reasonable jury could conclude that this constitutes substantial evidence

15 of pretext, discrimination, or discriminatory motive on behalf of Defendants.

16        Plaintiffs list several other brief pieces of evidence that they argue demonstrate

17 pretext. (Doc. 87 at 19-20). Like those addressed above, however, the Court does not find

18 them—even when viewed cumulatively with the others—to be "substantial" or to raise a

19 triable issue as to whether Defendants possessed racially discriminatory motives for their

20 actions.

21        In sum, Plaintiffs' circumstantial evidence—even when viewed cumulatively and

22 in the light most favorable to Plaintiffs—would not allow a reasonable jury to conclude

23 that Defendants' otherwise legitimate explanations for their actions were merely a pretext

24 for intentional discrimination. Although the circumstantial evidence Plaintiffs provide is

25 specific, it is not substantial. Even if Plaintiffs had presented a prima facie § 1981 claim,

26 they would still not have a viable claim because they have not met their burden of showing

27 pretext. The Court will therefore grant Defendants' Motion for Summary Judgment as to

28 Plaintiffs' § 1981 claims.

E.      **Plaintiffs' Remaining Claims**

Because the Court grants Defendants' Motion for Summary Judgment as to Plaintiffs' § 1981 claims, it must also grant the Motion as to Plaintiffs' remaining § 1983, § 1985, and § 1986 claims, which are all ultimately predicated on what is an invalid § 1981 claim. See Astre, 804 Fed. App'x at 667-68.

**IV.   Conclusion**

On this record, no reasonable jury could conclude that Defendants intentionally discriminated against Plaintiffs on the basis of race. The record does not show any impairment of Plaintiffs' contractual relationship with Defendants and thus does not support a prima facie § 1981 claim. Even if Plaintiffs had presented a prima facie case under § 1981, the evidence that Plaintiffs have presented is insufficient to show that Defendants' legitimate, nondiscriminatory reasons for their actions were merely a pretext for racial discrimination. Because Plaintiffs have failed to raise a genuine issue of material fact as to their claims, Defendants are entitled to summary judgment.

Accordingly,

**IT IS HEREBY ORDERED granting** Defendants' Motion for Summary Judgment. (Doc. 77).

**IT IS FURTHER ORDERED directing** the Clerk of the Court to enter judgment in favor of Defendants and terminate this case.

Dated this 10th day of January, 2023.

Honorable Stephen M. McNamee
Senior United States District Judge